## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **ANTHONY McPHERSON,** | : | **CASE NO. 1:11-CV-0954** |
| | : | |
| **Plaintiff,** | : | **MAGISTRATE JUDGE** |
| | : | **VERNELIS K. ARMSTRONG** |
| **vs.** | : | |
| | : | **MEMORANDUM OPINION** |
| **MICHAEL J. ASTRUE,** | : | **AND ORDER** |
| | : | |
| **Defendant.** | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) of Defendant's final determination denying his claim for Period of Disability and Disability Insurance Benefits (DIB) under Title II of the Act, 42 U. S. C. §§ 405 et seq and his claim for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq.  On September 7, 2011, the parties to this action consented to have the undersigned Magistrate adjudicate all further proceedings and enter judgment in this case pursuant to 28 U.S.C. § 636 (c) and Fed.R.Civ.P. 73 (Docket No. 12).  Pending are the parties' briefs on the merits (Docket Nos. 16 & 19).  For the reasons that follow, the Magistrate Orders that the Commissioner's Decision be Affirmed.

## I.  Procedural Background

On September 14, 2007, The Plaintiff, Anthony McPherson, filed his Title II application for Period of Disability and Disability Insurance Benefits (Tr. 144)[1]. On September 27, 2007, Plaintiff also filed his Title XVI application for Supplemental Security Income (Tr. 147).  As to both claims, Plaintiff alleged disability due to a "[f]ractured back" and depression beginning on August 25, 2007 (Tr. 63-64, 139-49, 191).  On December 19, 2007, both of Plaintiff's claims were denied initially.  On August 12, 2008, both claims were again denied upon reconsideration (Tr. 71-81, 83-85, 91-104).

On August 21, 2008, Plaintiff filed a written request for a hearing (Tr. 105).  On April 23, 2010, Plaintiff appeared, with counsel, and testified at the hearing before Administrative Law Judge (ALJ) Kendra Kleber.   Vocational Expert Bruce Holderead also appeared and testified at the hearing (Tr. 28-61).  On June 9, 2010, ALJ Kleber issued a Notice of Decision - Unfavorable (Tr. 9-27).  On July 19, 2010, Plaintiff objected to the ALJ's findings and requested review of the hearing decision (Tr. 8).  Finding no basis for review, on April 1, 2011, the Appeals Council issued a Notice of Appeals Council Action, leaving the hearing decision as the final decision of the Commissioner (Tr. 1-3).  On May 5, 2011, Plaintiff filed his Complaint with this Court seeking judicial review pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. 1383(c)(3) (Docket No. 1).

## II.  Jurisdiction

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and1383(c)(3).  McClanahan v. Commissioner of Social Security, 474 F.3d

---

[1]  All references to the transcript in this Opinion refer to Docket No. 10, with page number references to the page numbers located at the lower right.

830, 832-33 (6th Cir. 2006).

## III.  Factual Background

### A.  Plaintiff's History

Plaintiff was born on September 13, 1958 and was 48 years old as of his alleged onset date of  August 25, 2007 (Tr. 147).  Plaintiff has received formal education through the ninth grade (Tr. 163) [high school (Tr. 195)] and vocational education at a truck driving school and has work history as a machine operator, painter and truck driver (Tr. 52, 158,163, 178,192, 195-96, 214, 260-262).

### B.  Relevant Medical Evidence and Opinion

#### 1.  Physical Condition

●**April, 1997**, Plaintiffs medical history includes an injury to the left foot with amputation of his left great toe (Tr. 272-274).

**Fall From Ladder**
●**Late August, 2007**, Plaintiff sustained injuries to his back and shoulder, including a T3 burst fracture, due to a 15 to 20 foot fall from a ladder onto a concrete surface (Tr. 336).  During hospitalization for these injuries, he complained of headaches and back pain, and went through physical therapy (Tr. 289-343, 306, 308, 336–40 462, 592).  Doctors noted that Plaintiff was neurologically stable and surgical intervention was not required (Tr. 304). Plaintiff was discharged with a temporary prescription for a wheeled walker (Tr. 324).

●**October, 2007, MRI**  confirmed a moderate wedge compression T3 deformity (Tr. 483).

**Dr. Wilfredo Paras, M.D. - Consultative Examining Physician**
●**December, 2007**, approximately three months after the fall from the ladder, Plaintiff underwent a consultative examination by Dr. Paras  (Tr. 369–76).  Plaintiff complained of constant back pain, right foot weakness, and problems balancing secondary to amputation of his left toe in 1997 (Tr. 369).  Dr. Paras noted that Plaintiff walked and moved slowly, used a cane, and wore a body immobilizer (Tr. 369–70). Examination revealed decreased deep tendon reflexes bilaterally (Tr. 368-76).  Dr. Paras stated that he believed that Plaintiff's ability to perform work-related physical activities was "severely limited by his current back condition" (Tr. 370).

3

**Dr. Jerry McCloud, M.D. - State Reviewing Physician**
●**December, 2007**,, completed a residual functional capacity assessment (Tr. 377–84). Dr. McCloud opined that Plaintiff was limited to sedentary work with certain postural and environmental limitations (Tr. 378–81).  Plaintiff was able to lift a maximum of ten pounds occasionally and frequently, with reduced bilateral overhead reaching (Tr. 377-384).  As a basis for his opinion, Dr. McCloud cited Dr. Paras's evaluation (Tr. 378).

**Meridia Huron Hospital Meridia Huron Hospital**
●**Early January 2008** Plaintiff visited the hospital, complaining of dizziness and a headache (Tr. 388, 392, 395). Doctors noted that Plaintiff dragged his left foot (Tr. 573).  During this visit a series of diagnostic studies were done, the results of which were negative (Tr. 395, 414–23).
●**Neurologist Jacob Slepian, M.D.**, noted no neurological deficits and assessed that Plaintiff had post-concussive syndrome.  Plaintiff was discharged to home (Tr. 394).
●**October 31, 2008**, x-rays  indicated mild cervical degenerative disc disease, degenerative changes throughout the thoracic spine, and degenerative disc disease with narrowing of the disc spaces at L3-4 and L4-5 (Tr. 525-527).
●**March, 2009**, Plaintiff returned with complaints of low back and neck pain. x-ray indicate degenerative osteophytes and disc space narrowing at L4-5 (Tr. 540-541).

**Dr. James Gahman, M.D. - State Agency Reviewing Physician**
●**August, 2008**, reviewed Plaintiff's records (Tr. 498–99). Dr. Gahman stated that there was no evidence of nerve root compression and that nerve root compression from the T3 fracture, which occurred as a result of the August, 2007 accident, would normally be along the ribs (Tr. 498). He opined that Plaintiff would not have ongoing thoracic pain, unless the compression fracture had not healed.  (Id.). Dr. Gahman also noted that there was no evidence that Plaintiff needed a hand-held assistive walking device.  Dr Gahman also questioned the need for a cervical collar as he did not believe Plaintiff had any cervical problem (Id.). Dr. Gahman affirmed Dr. McCloud's December 2007 functional capacity opinion (Tr. 499).

**Dr.Sheikh Asaduzzaman, M.D. - Examining Physician**
●**September 2008**, examined Plaintiff for neck pain and noted that Plaintiff's gait was normal, sensation grossly intact, and there were no motor deficits (Tr.503). Plaintiff complained of lower back pain in
●**January, 2009**; found that Plaintiff had only mildly positive straight leg raising (Tr. 547–48).
●**March, 2009**,  described Plaintiff's gait as stable with normal tone, sensation, and motor functioning in his lower extremities (Tr. 542). He also noted "a lot of pain behaviors and learned tightness" (Id.). EMG testing showed no evidence of lumbar radiculopathy on the left (Tr. 539).

**Dr. Daniel Malkamaki, M.D. - Treating Emergency Room Physician**
●**June. 2009,** indicated that Plaintiff's gait was stable in June 2009 (Tr. 534). Plaintiff was seen in the emergency room with complaints of back, groin, leg pain and pain radiating into his lower extremities that he stated had begun after doing two days of yard work and climbing up and down a ladder (Tr.513–14). He was treated for lumbar strain with radiculopathy (Tr. 521-522).

●**July, 2009**, Plaintiff visited the hospital on follow-up, complaining of back pain after painting (Tr. 529).
●**October, 2009, MRI** of cervical and thoracic spine revealed mild disc bulging at C3-4 and C4-5,  with minimal cord flattening, a small right parasagital disc protrusion T7-8 with minimal cord flattening, and a remote compression fracture at T3 (Tr. 567-569), remote compression deformity, and a small disc protrusion (Tr. 567–68).

**Pradeep Bhat, M.D. - Treating Physician**
●**November, 2009**, Plaintiff sought treatment for lower back and neck pain that allegedly worsened with activity, difficulties with his left upper extremity  (Tr. 564). Per examination, Dr. Bhat noted that Plaintiff's condition was only remarkable for a weak grip and mild reduction in touch on the left side, as straight leg testing was negative and normal strength was noted in the lower extremities (Tr. 564–65).
●**February, 2010**, Dr. Bhat noted that Plaintiff's lower back pain was stable, but his symptoms worsened after slipping in the snow on the date of his visit (Tr. 635).

### 2.  Mental Condition

Plaintiff has asserted no objections to the ALJ's evaluation of his alleged mental impairments and certain physical impairments. The Court deems such arguments waived. See McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

### C.  Hearing Testimony

#### 1.  Plaintiff's Testimony

At the April 23, 2010, hearing Plaintiff testified, with counsel, before the ALJ (Tr. 28–61).  Plaintiff testified that he had been unable to work since August 25, 2007, the date of his accident.  He stated that since that date he had had difficulty with his entire left side as well as occasional spells of dizziness (Tr. 36). He explained that the dizziness occurs with postural changes, e.g., bending and stooping.  Plaintiff also testified that he is being treated for that dizziness with prescription Meclizine (Tr. 37-38).  After his accident in August of 2007, doctors

recommended physical therapy, but Plaintiff's therapist recommended home exercises, when physical therapy stopped shortly after his accident (Tr. 47–48).

Regarding his pain, Plaintiff testified that it radiated from his neck down into his left leg (Tr. 40). He indicated that his pain prevents him from walking and standing for sustained periods of time and that he used an assistive device, i.e., a cane, for support, with his physician's knowledge, since the accident (Tr. 42-43).  He said that his doctors were aware that he used a cane, but it had not been prescribed by a physician or other care giver (Tr. 42).  He noted that his use of the cane is necessary, since without it, he will trip or need to lean on something to catch himself, and that when at home and not using cane he holds onto tables and chairs for support (Tr. 46-47).   In 2007, Plaintiff started using a walker as an assistive device, but later switched to a cane on his own (Tr. 42–43, 45–46).

Plaintiff also testified that when he sits for prolonged periods he experiences numbness in his left arm and leg. He said that he cannot lift a gallon jug and that he was told by his physician not to buy them (Tr. 44-45). Plaintiff testified that he does not drive because since he is unable to maneuver and look from left to right (Tr. 40).  He stated that he has received various treatments for his back pain, including pain medication, muscle relaxers, injections, physical therapy and home exercises (Tr. 38-39, 41).  Plaintiff acknowledged that he derived benefit and experienced no side effects from the medications that he used to treat his dizziness and pain (Tr. 36–39, 41–44).   Plaintiff also lost the big toe of his left foot in an accident (Tr. 49).

### 2.  Vocational Expert Testimony, VE Bruce Holderead

Vocational Expert Bruce Holderead also testified at the hearing (Tr. 51–59). The ALJ posed a hypothetical question to the VE, asking whether there were jobs that a hypothetical

person with Plaintiff's vocational characteristics could perform if the work were limited to light work and the person was without use of his dominant hand 50 percent of the workday as a result of his reliance on and  use of a cane (Tr. 53–54).  The VE stated that the use of the cane resulted in a job base that was  "pretty close to sedentary" (Tr. 54-57).  That being so, the VE stated that such a person would not be able to perform his past work (Tr. 54-57).  However, the VE also stated that such a person could perform jobs such as office helper (70,000 jobs nationally, 2,200 in Ohio, 600 in Northwest Ohio), photocopy machine operator (130,000 jobs nationally, 900 in Ohio, 300 in Northwest Ohio), and mail clerk (35,000 jobs nationally, 1,400 in Ohio, 375 in Northwest Ohio), among other jobs (Tr. 54–58).  When questioned about a ten-pound lifting limitation, the VE testified that such a limitation would further erode the job base (Tr. 59).

### D.  Other Evidence - Third Party Report from Plaintiff's Mother

In a third party report, provided by Plaintiff's mother, she stated that Plaintiff's activities included walking, reading, watching television, making meals, shopping for groceries, visiting the library, and socializing with friends and family (Tr. 235–40).  Plaintiff's mother also reported that Plaintiff could not take out the garbage or tie his shoes (Tr. 241).

### IV. Analytical Overview: Determining Disability

DIB and SSI are properly awarded only to applicants who are determined to suffer from a "disability."  Colvin v. Barnhart, 475 F.3d 727, 730 (6th Cir. 2007), (citing, 42 U.S.C. § 423(a), (d)).    "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  Colvin, supra,  (475 F.3d at 729), citing, 42 U.S.C. § 423(d)(1)(A) (definition

used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI

context)).

In determining disability under 42 C.F.R..§§ 404.1520 and 416.920, the ALJ must

undertake a five step sequential analysis:

**Step 1**: Determine whether the applicant is  engaged in "substantial gainful
activity" at the time benefits are being sought.  If yes,  the applicant is not
disabled. If no, then move to step 2.[2]

**Step 2**: Determine whether the applicant suffers from any impairment which,
either by itself or in combination with one or several other impairments, is
"severe."  If there is no finding of a "severe" impairment, then there is no
disability.  If there is a determination that the applicant suffers a "severe"
impairment, move to step 3.[3]

**Step 3**: Determine whether any previously identified severe impairment meets or
equals a listing in the Listing of Impairments.  If yes, then the applicant is
disabled.  If no, proceed to step 4.[4]

**Step 4**: Determine if the applicant retains sufficient "residual functional

---

[2]  Substantial gainful activity is defined as work activity that is both substantial and
gainful. "Substantial work activity" is work activity that involves doing significant physical or
mental activities.  20 C.F.R § 404.1572(a) and 20 C.F.R § 416.972(b). "Gainful work activity" is
work that is usually done for pay or profit, whether or not profit is realized.  20 C.F.R §
404.1572(b) and 20 C.F.R § 416.972(b).  If an individual engages in substantial gainful activity
that person is determined not to be disabled, regardless of the severity of any otherwise identified
impairments, mental or physical.

[3]  Under the regulations, an impairment or combination of impairments is "severe"if it
significantly limits the individual's ability to perform basic work activities. Impairments are "not
severe" where medical and other evidence establish only slight abnormalities, individually or in
combination, that have no more than a minimal, adverse effect on the individual's ability to
work.  20 C.F.R § 404.1521 and 20 C.F.R § 416.921.

[4]  The previously identified severe impairment or combination of impairments must meet
or medically equal an impairment listed in 20 C.F.R Part 404, Subpart P, Appendix 1.  20 C.F.R
§§  404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and  416.926.

capacity"[5] to allow for the performance of his past, relevant work.  If  the
applicant possesses sufficient residual functional capacity to perform his past
relevant work, then there is no disability.  If not, move to step 5. [6]

**Step 5**: Determine if there are jobs in the current economy that applicant could
perform, given the limits of her residual functional capacity and consistent with
the applicant's other relevant characteristics.  If there are such jobs, then the
applicant is not disabled.  If there are no such jobs, then the applicant is disabled.
[7]

See Heckler v. Campbell, 461 U.S. 458, 460, 76 L. Ed. 2d 66, 103 S. Ct. 1952 (1983), see also

Combs v. Comm'r of Soc. Sec., 400 F.3d 353 (6th Cir. 2005),  Jones v. Comm'r of Soc. Sec., 336

F.3d 469, 474 (6th Cir. 2003);  Preslar v. Sec'y of Health & Human Servs., 14 F.3d 1107, 1110

(6th Cir. 1994).  20 C.F.R. § 404.1520 (1982););  Tyra v. Secretary of Health and Human

Services, 896 F.2d 1024, 1028-29 (6th Cir. 1990),.  Moon v. Sullivan, 923 F.2d 1175, 1181 (6th

Cir. 1990).

## V. The ALJ's Findings

---

[5]  A determination of the applicant's residual functional capacity must be done before the
determination of whether applicant can perform past relevant work. .  20 C.F.R § 404.1520(e)
and 20 C.F.R § 416.920(e).  An applicant's residual functional capacity is the ability to perform
physical or mental work activities on a sustained basis even though the applicant may suffer
limitations from his impairments. In making a residual functional capacity determination all the
applicant's impairments, including those impairments that are not severe, must be considered.  20
C.F.R § 404.1520(e), 20 C.F.R §§ 416.920(e) and 416.945.

[6]  Past relevant work means work performed either as the applicant actually performed it
or as it is generally performed in the national economy either within the past 15 years or 15 years
prior to the date the disability must be established. Additionally the work must have lasted long
enough for the applicant to have learned the job and for it to have become substantial gainful
activity for him.  20 C.F.R §§ 404.1560(b) 404.1565 and 20 C.F.R §§ 416.960(b) and 945.965.

[7]  The determination of whether the applicant can do any work at all must take into
consideration the applicants residual functional capacity along with the applicant's age,
education and work experience.  At this stage the burden is upon the Commissioner to show that
work exists in significant numbers within the economy that the applicant can do, given the
applicant's limiting characteristics.  20 C.F.R §§ 404.1512(g) 404.1560(c) and 20 C.F.R §§
416.912(g) and 945.960(c).

The ALJ made the following findings:

**1**. The claimant met the insured status requirements of the Social Security Act through December 31, 2008 (Tr. 14).
**2**. The claimant has not engaged in substantial gainful activity since August 25, 2007, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.) (Tr. 14).
**3**. The claimant has the following severe impairments: status post T3 burst fracture and left great toe amputation (20 CFR 404.1520(c) and 416.902(c)) (Tr. 14).
**4**. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926)(Tr. 16).
**5**. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)(Tr. 17).
**6**. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)(Tr. 20).
**7**. The claimant was born on September 13, 1958 and was 48 years old, which is an individual closely approaching advanced age, on the alleged disability onset date 20 CFR 404.1563 and 416.963)(Tr. 21).
**8**. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964)(Tr. 21).
**9**. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (Tr. 21).
**10**. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))(Tr. 21).
**11**. The claimant has not been under a disability, as defined in the Social Security Act, from August 25, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g))(Tr. 21).

(Tr. 14-21).

## VI. Standard of Review

District Court review of Commissioner of Social Security disability determinations is

limited to evaluating whether the decision made by the Commissioner is supported by

"substantial evidence" and consistent with applicable, legal standards.  Colvin v. Barnhart ,

supra, 475 F.3d at 729.  The district court shall affirm  the Commissioner's conclusions unless

the Commissioner failed to apply the correct legal standard or made findings of fact that are

unsupported by substantial evidence. McClanahan v. Comm'r of Soc., 474 F.3d 830 at 833 (citing Branham v. Gardner, 383 F.2d 614, 626-627 (6th Cir. 1967)). The Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence. Id. (citing 42 U.S.C. § 405(g )).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (citing Besaw v. Secretary of Health and Human Services, 966 F.2d 1028, 1030 (6th Cir. 1992)). See also Cutlip v. Sec'y of Health & Human Servs, 25 F.3d 284, 286 (6th Cir. 1994).

"The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

Moreover, because district court review of the Commissioner's decision is, essentially, appellate in character, the court is not to undertake de novo review, and is restrained from attempting to resolve evidentiary conflicts as well as from making credibility determinations. Cutlip, supra 25 F.3d 284, 286 (citing Brainard v. Secretary of Health and Human Services, 889 F. 2d 679, 681 (6th Cir. 1989); Garner v. Heckler, 745 F. 2d 383, 387 (6th Cir. 1984)). Rather, the reviewing court is bound to affirm the Commissioner's decision, provided that such decision is supported by substantial evidence, even if the court were inclined to have decided the case differently. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999). Where supported by substantial evidence, the Commissioner's findings must be affirmed, even if there is evidence

11

favoring plaintiff's side.  <u>Listenbee v. Sec'y of Health & Human Servs.</u>, 846 F.2d 345, 349 (6th

Cir. 1988).  The decision by the administrative law judge is not subject to reversal even where

substantial evidence could have supported an opposite conclusion.  <u>Smith v. Chater</u>, 99 F.3d 780,

781-82 (6th Cir. 1996).

## VII.  Issues Before the Court

This case raises two issues for review.

Issue No. 1  Whether Substantial Evidence Proves the ALJ Improperly Assessed Plaintiff's
Credibility and Complaints of Pain.

Issue No. 2. Whether the ALJ's Determination That Mr. Mcpherson Can Perform Light Work Is
Supported by Substantial Evidence.

## VIII.  Discussion

**Issue No. 1:  Credibility and Complaints of Pain.**

Plaintiff asserts that the ALJ's determination that his complaints of pain and associated

limitations were not credible was unreasonable and not supported by substantial evidence   As a

general principle, credibility determinations regarding the subjective complaints of claimants

(e.g., complaints of pain), which must be reasonable and supported by more than a scintilla of

evidence, are squarely within the province of  the ALJ, who "may not focus and base [its]

decision entirely on a single piece of evidence, and disregard other pertinent evidence." <u>Sias v.</u>

<u>Secretary of Health and Human Services</u>, 861 F.2d 475, 479 fn.1 (1988).  Thus, credibility

determinations shall be based on a review of the whole of the record.

Plaintiff raises three specific arguments in support of his Issue No. 1 that the ALJ erred in

her credibility assessment of Plaintiff's pain, asserting that the ALJ erred in her: reliance on

Plaintiff's past drug use; failing to accord appropriate weight to the opinions of Drs. Paras and

McCloud, and judgement regarding the significance of Plaintiff's use of a cane.  Additionally,

Plaintiff argues, generally, that the ALJ erred in her credibility assessment of Plaintiff's

allegations of pain.

### Cocaine

Plaintiff sustained a fall from a 15 to 20 foot high ladder on August 25, 2007.  Upon

presentation at the emergency room, Plaintiff was diagnosed with a T3 burst fracture.  Plaintiff

was also determined to be positive for cocaine on urinalysis (Tr. 591-592).  Plaintiff asserts that

despite there being no further mention in the record of ongoing drug use after August, 2007, the

ALJ nevertheless erroneously based her decision regarding Plaintiff's credibility and her finding

that Plaintiff did not suffer from disabling pain on this factor of Plaintiff's drug use alone.

(Docket No. 16, 6–9).

Regarding Plaintiff's objection that the ALJ inappropriately based her determination on

Plaintiff's drug use, it is the opinion of this Court that the Plaintiff substantially misrepresents

this reference (to Plaintiff's drug history) in the ALJ's decision.   Plaintiff's contentions to the

contrary, the ALJ briefly mentioned Plaintiff's past drug use history, only noting that Plaintiff

used drugs sometime before his accident in August 2007 (Tr. 15, 18).  The ALJ also stated that

consultative psychological evaluator, Sally Felker, Ph.D. had diagnosed Plaintiff with mixed

substance abuse, in recent remission (Tr. 19–20).  However, review of this portion of the ALJ's

Decision does not reveal that the ALJ stated or believed that there was any evidence or

indication that Plaintiff used drugs after August 2007.   More importantly, there is no indication

in the ALJ's Decision that she based her credibility assessment regarding Plaintiff's claims of

pain in any way on Plaintiff's past drug use. On the contrary, in making her credibility

13

determination, the ALJ cited various other factors supporting her determination to discount Plaintiff's credibility.   (Tr. 17–20).  See, discussion, <u>infra</u>.  Accordingly, this Court rejects this contention as to Plaintiff's Issue No. 1.

### Discounted opinions of Drs. Paras and McCloud

Plaintiff also argues that the ALJ inappropriately discounted the views and opinions of two physicians, Dr. Wilfredo Paras, M.D. and state agency medical consultant, Jerry McCloud, M.D., due to these sources having observed and opined regarding Plaintiff's condition within a short time after his August, 2007 accident  Plaintiff essentially argues that the temporal proximity of these physicians' opinions to the accident is a factor of little relevance to the larger issue of Plaintiff's disability and that the fact that these evaluations were made just a few months after Plaintiff's accident should not effectively marginalize their importance as determinants of Plaintiff's disability.

Specifically, Plaintiff states that consultative examiner Dr. Paras examined Plaintiff in December, 2007, and noted  that Plaintiff's deep tendon reflexes were diminished bilaterally, that Plaintiff reported continued pain and that Plaintiff was also found to have decreased range of motion in both shoulders.  Plaintiff further noted that Dr. Paras opined that Plaintiff's "ability to perform work-related activities are severely limited by his current back condition."  Plaintiff states' that the ALJ erroneously concluded that this statement referred to Plaintiff's status at that specific moment only, and failed to account for Plaintiff's reports of continuing pain (Tr. 18, 40, 368-376).

As to state agency medical consultant Dr. McCloud,, who reviewed the medical evidence in December, 2007, he opined that Plaintiff was limited to sedentary work reduced by

postural and environmental limitations (Tr. 377-384), Plaintiff argues that the ALJ also

erroneously dismissed this opinion because of its proximity to the injury date. (Tr. 18).

Plaintiff argues that this view is unsupported because he has continued to present with

complaints of back and neck pain well after these examinations.

Plaintiff supports these arguments by noting that in June 2009, almost two years after the

accident, Plaintiff presented to MetroHealth Medical Center complaining of radiating pain from

his low back into his lower extremities and was, at that time, diagnosed with lumbar

radiculopathy (Tr. 514).  Additionally Plaintiff directs the Court's attention to an MRI from

October, 2009, which purportedly revealed new cervical and thoracic findings in addition to his

T3 compression fracture: specifically, mild disc bulging at C3-4, C4-5 with minimal cord

flattening and a small right parasagital disc protrusion at T7-8 with minimal cord flattening (Tr.

567-569).  Additionally, to support his contention that Drs Paras's and McCloud's opinions from

late 2007 are consistent with the whole of Plaintiff's medical record, Plaintiff refers to medical

records of November, 2009, which evince that Plaintiff continued to complain of chronic neck

and back pain, which Plaintiff stated was made even worse by activity (Tr. 564).

Plaintiff's arguments regarding the ALJ purportedly improperly discounting the opinions

of Drs. Paras and McCloud are unpersuasive.

Dr. Paras opined in December, 2007, three to four months after Plaintiff's fall and during

his recovery period, and stated that Plaintiff's ability to perform work-related physical activities

was "severely limited by his current back condition" (Tr. 370).  More or less

contemporaneously, just a week and a half later, Dr. McCloud opined that Plaintiff was limited

to sedentary work with certain postural and environmental limitations, and he relied mostly upon

Dr. Paras's opinion (Tr. 378–81). As the ALJ correctly stated, she accorded these opinions less weight because the two doctors offered them "within a short period after the claimant's injury and [they reflect] limitations reasonably attributed to his recovery" (Tr. 18). Dr. Paras himself indicated that his assessment of Plaintiff's severe limitations related to Plaintiff's then (post-accident, late-2007) "current" back condition support the ALJ's analysis. [Ex.. 12F]

Moreover, the ALJ went on to explain that "[s]ubsequent evidence does not support the notion that the degree of limitation . . . continued to be accurate" (Tr. 18). The ALJ's analysis was proper and supported by the record.

As discussed above, Plaintiff claims that the ALJ erred because Plaintiff "continued to present with complaints of back and neck pain" after Dr. Paras's late, 2007, examination and diagnostic testing revealed some abnormalities (Docket No. 16, 8). The ALJ did acknowledge that Plaintiff continued to complain of pain and receive treatment thereafter (Tr. 18–19). However, the mere fact that Plaintiff experienced pain does not mean that his condition did not gradually improve or that he was disabled.

As the ALJ noted, diagnostic tests and examinations performed subsequent to 2007 were, generally, unremarkable (Tr. 18–19). This subsequent history includes treatment by neurologist Dr. Sepian, who found no neurological deficits, and related unremarkable testing done around January 2008 (Tr. 394–95, 414–23), examinations by Dr. Asaduzzaman in 2008 and 2009 who found Plaintiff's condition to be mostly unremarkable (Tr. 503, 542, 547–48), an April 2009 EMG test that revealed no evidence of lumbar radiculopathy on the left side (Tr. 539), and examinations by Dr. Bhat, which showed mostly mild results and pain exacerbation due to a specific incident of Plaintiff having slipped in the snow (Tr. 564–65, 635).

16

Plaintiff emphasizes the late, 2007 opinions of Drs. Paras and McCloud but minimizes or ignores most of evidence, referenced above.   In support of his argument, Plaintiff does advert to the treatment he received in June, 2009 treatment, (with associated diagnosis of lumbar radiculopathy) (Docket No. 16, 7).   Yet, Plaintiff fails to mention that his June, 2009 pain was an exacerbation of a his condition due to overexertion as a consequence of performing activities that Plaintiff has otherwise claimed he was incapable of performing, e.g., painting. (Tr. 513–14).

Additionally, Plaintiff seeks to rely on the MRI results of October, 2009 (Docket No. 16, 7, 8).  However, the results of this MRI disclose primarily mild findings. (Tr. 567–68). Plaintiff draws attention to his November, 2009 complaints to Dr. Bhat of continued neck and back pain (Docket No. 16, 7), but he fails to mention that, pursuant to his examination, Dr. Bhat found Plaintiff was only  remarkable for a weak grip and mild reduction in touch on the left side and was otherwise normal (Tr. 564–65).

A fair review of the medical record supports the ALJ's determination that Plaintiff's condition improved with treatment after his August 2007 accident.

Plaintiff also relies upon his own testimony that he was treated with pain medications, muscle relaxers, injections, and physical therapy in support of his claim regarding the credibility of his allegations of pain (Docket No. 16, 7).  The converse of this, however, is that Plaintiff also testified that his pain medications helped control his pain (Tr. 39).  Regarding pain treatment, Plaintiff also fails to mention that he stopped physical therapy shortly after the accident of August, 2007 (Tr. 59–60).  Plaintiff's testimony does not necessarily establish that the ALJ erred in her determination regarding Plaintiff's credibility or the persistence and intensity of his pain or that the record provided substantial evidence in support of the ALJ's Decision in this regard.

17

**Cane**

Also to support his contention regarding the applicability of the opinions of Dr. Paras and Dr. McCloud, Plaintiff adverted to his hearing testimony that he was treated for pain with pain medications, muscle relaxers, injections and physical therapy (Tr. 38-39, 41), that he uses a cane for support, that around his home and when not using his cane, he uses tables and chairs in his vicinity for support (Docket No. 16, 7, 8–9;. Tr. 46-47), and that his physicians were aware that he used a cane (Tr.  42-43). Plaintiff asserts that his need for a cane is credible and supported by the record and therefore should have been included in the ALJ's assessment of his residual functional capacity.

The ALJ reviewed the record and determined that "there is no evidence that ongoing use of the cane was ordered or obligatory" (Tr. 18).  By way of challenge, Plaintiff states that "the continued use of a cane was made known to his physicians" (Docket No. 16, 7).

Doctors who examined Plaintiff after December,  2007 (e.g., Drs. Slepian, Asaduzzaman, Malkamaki, and Bhat) rarely made any mention of Plaintiff using a cane or other walking assistive device.  Additionally, reviewing source, Dr. Gahman,  found no evidence that Plaintiff needed a hand-held assistive walking device (Tr. 498)   In contrast to what Plaintiff attempts to argue by emphasizing his alleged reliance on a cane,  Plaintiff's doctors noted on multiple occasions that his gait was normal (Tr. 18–19, 503, 534, 542).   Moreover, the ALJ also pointed out that various activities in which Plaintiff engaged, e.g., painting, climbing up and down a ladder, and performing two days of yard work (Tr. 513–14, 529), belied his claimed need for a cane (Tr. 19).

Plaintiff cites to one page within his medical record, that "[e]vidence of record  notes

18

weakness in his lower extremities which is a credible basis for the use of a cane" (Docket No. 16, 8).  However, this reference is from Dr. Paras's December 2007 evaluation (Tr. 370), which, as discussed, above, is of contested significance, and, appropriate to a post-accident time frame during which Plaintiff was still going through a recuperation period, and therefore, contrary to Plaintiff's view, was not inconsistent with the ALJ's finding that Plaintiff's condition improved thereafter (Tr. 18).

However, even if it were to be assumed that evidence did not support the ALJ's finding regarding Plaintiff's alleged need for a cane, Plaintiff has not taken the next, necessary step and shown how this (i.e., the supposed need for the use of a cane) would have made a difference to the final disability determination.  Indeed, the VE  testified that someone with Plaintiff's vocational characteristics could still perform a number of jobs if limited to light work without use of his dominant hand for 50 percent of the workday due to the use of a cane (Tr. 53–58). Plaintiff's argument regarding his alleged need for cane is, thus, unpersuasive and, at best, indicates only harmless error.  Shinseki v. Sanders, 129 S. Ct. 1696, 1706 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); see also Rabbers v. Comm'r of Soc. Sec., 582 F.3d 647, 654 (6th Cir. 2009) (similar).

### Credibility of Plaintiff's Allegations of Pain, Generally

### Rule for Analyzing Allegations of Pain

The Social Security regulations establish a two-step process for evaluating pain. 20 CFR section 404.1529, Social Security Ruling (SSR) 96-7p.  This process can be summarized as follows:

1. Determine whether there is objective medical evidence for the claimants allegation of pain.  If there is no such objective basis, the analysis need not proceed.  However, if there is an objective basis for a claimant's reports of pain, then the assessment must proceed to the next stage which requires, either

> a.  determining whether the (previously identified) objective medical evidence confirms the severity of the pain alleged to have arisen therefrom, or
>
> b.  determining whether the (previously identified) objective medical evidence is sufficiently severe that it is reasonable to conclude that it caused the pain described by the claimant.

See Duncan v. Secretary of Heath and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

In addition to undertaking an examination of the objective medical evidence of a claimant's allegation of pain, the ALJ is also required to assess a claimant's reports of pain utilizing the following six. criteria, summarized, below.

1.  The effect of the pain on the claimant's daily activities.
2.  The bodily location, amount of time experienced, frequency of occurrence and description of the intensity of the pain.
3.  Factors that precipitate or aggravate the manifestation of pain.
4.  The use of pain relief medications, including the type, dosage regimen, effectiveness and side effects of such pain relief therapies and medications.
5.  The use of non-medication pain relief therapies, including the type, usage regimen, effectiveness and side effects of such pain relief therapies and medications.
6.  The opinions and statements of claimant's doctors.

See Felisky v. Bowen, 35 F.3d 1027, 1038-40 (6th Cir. 1994).

Therefore, the ALJ shall first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the claimant's pain and, second, after identifying the underlying, objectively determinable cause, assess the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. See Duncan and Felisky, supra.   Additionally the ALJ shall assess the claimant's credibility and consider,

inter alia, the claimant's statements about pain, its location, duration, frequency, etc., and other symptoms, along with the rest of the relevant evidence in the record, in accordance with the factors outlined in Social Security Ruling 96-7p. See SSR 96-7p. Felisky, 35 F.3d at 1039-40.

### Credibility of Plaintiff's Pain Claims

Plaintiff argues that because the objective medical evidence, see discussion, infra, confirms the severity of his condition, the responsibility of the ALJ was only to determine whether Plaintiff's conditions were of such severity that they could be reasonably expected to produce the disabling pain. Plaintiff asserts that in this case they were.

It is opinion of this Court that substantial evidence supports the ALJ's Decision that Plaintiff was not disabled.

The ALJ reasonably found that Plaintiff was capable of performing the full range of light work and was not disabled. She thoroughly reviewed the record, including Plaintiff's treatment notes for back and neck injuries following his accident in August 2007 (Tr. 14–20). The ALJ reasonably found that Plaintiff's complaints of debilitating pain were not fully credible, as they were inconsistent with the record as a whole (Tr. 17–20).

Review of the record in this case and the ALJ's decision shows that the ALJ assessed Plaintiff's medical record and identified various factors such as Plaintiff's ability to perform a number of different activities, improvement in Plaintiff's condition after his August 2007 injury, mild diagnostic testing and examination results, and noted pain behavior (Tr. 16, 17–20).

In the opinion of this Court, the ALJ reasonably evaluated Plaintiff's credibility when conducting her residual functional capacity assessment, and determined that Plaintiff's complaints of debilitating pain and symptoms were not fully credible (Tr. 17–20). The ALJ's

21

credibility finding is entitled to "great deference." <u>Warner v. Comm'r of Soc. Sec.</u>, 375 F.3d 387, 392 (6th Cir. 2004); <u>see</u> <u>also</u> <u>Cruse v. Comm'r of Soc. Sec.</u>, 502 F.3d 532, 542 (6th Cir. 2007) ("an ALJ's credibility determinations about the claimant are to be given great weight").

As discussed above, a claimant's allegations of pain are to be evaluated according to whether there is underlying medical evidence for the pain and whether such evidence confirms the intensity and severity of the pain.  <u>See</u> <u>Felisky</u>, <u>supra</u>, 35 F.3d at 1038–39

In the instant case the ALJ found that Plaintiff's claims of pain were reasonably related to Plaintiff's underlying, objective medical condition, but the severity of the symptoms as claimed by Plaintiff was not fully credible (Tr. 18).   The ALJ based her assessment on various factors including objective medical evidence on the record that showed improvement in Plaintiff's condition and mild testing and examination results (Id.). The ALJ also referenced Plaintiff's noted pain behavior and his ability to perform various daily activities, which behavior was considered to be inconsistent with Plaintiff's claims (Id.).

### Summary of Substantial Evidence Supporting ALJ's Credibility Assessment

•In summary the record evidentiary bases upon which the ALJ determined that Plaintiff's complaints of pain as to intensity, persistence and limiting effects severity are as follows:
•Surgical intervention was not required for Plaintiff's August 25, 2007 T3 burst fracture and Plaintiff was found to be neurologically stable when discharged on August 29, 2007 (Ex. 6F, 16; 26F, 22)
•Regarding the loss of Plaintiff's great left toe on July 30, 1997, Dr. Shu Huang noted on January 26, 2004 that the site had healed well and opined that Plaintiff should be able to function well at a medium level of physical exertion.
•January 19, 2008, a consultative examination by neurologist Dr. Jacob Sepian, M.D. identified no neurological deficits and evaluated Plaintiff as having post-concussive syndrome (Ex. 26F, 2-3, 33)
•March 19, 2009, Dr. Asaduzzaman stated that Plaintiff's vertigo was under control (Ex. 24F, 33).
•September 5, 2008, Dr. Asaduzzaman observed that Plaintiff had pain around left elbow, but revealed no limb weakness and normal reflexes (Ex. 22F, 3-4).
•November 4, 2009, Dr. Asaduzzaman, noted that Plaintiff took Vicodin two or three times a

week (with his most recent refill being in March, 2009) for pain in neck, back and left arm and leg, and that he had a weak grip, but his strength was 4/5 (Ex. 25F, 2).

●February 15, 2010, Dr. Baht stated that Plaintiff's grip weakness was variable and improved to 100% upon distraction, and there was no evidence of neural compression on MRI (Ex. 27F, 1-2).

●January 18, 2008, pursuant to emergency room admission for dizziness and headache, diagnostic studies including MRI, CT of the brain, ultrasound of the carotids and x-ray of the hip were negative, and Dr. Sepian opined that there were no neurological deficits (Ex. 26F, 2-3, 11).

●December 7, 2007, Dr. Paras's observation that Plaintiff's physical activities were severely limited due to his then "current back condition" (Ex. 11F).

●December 12, 2007, review by Dr. McCloud, that Plaintiff was at that time limited to sedentary work (Ex. 12F), was based on Dr. Paras's recent consultative examination, and subsequent evidence does not support the same degree of limitation assigned to Plaintiff in December, 2009. Despite Plaintiff dragging his foot during his January 18, 2008 emergency room admission, subsequent examinations have determined him to have normal gait.

●September 5, 2008, Dr. Asaduzzaman, noted Plaintiff's gait was normal, sensation was grossly intact and no motor deficits (Ex. 22F 3-4).

●March 30, 2009, Dr. Asaduzzaman described Plaintiff's gait as stable

●June 15, 2009, Dr. Malkamaki described Plaintiff's gait as stable during an office visit (Ex. 24, 22)

●March 30, 2009, Dr. Asaduzzaman's examination of Plaintiff revealed maximal tenderness on palpation over the lumbosacral junction with moderate to severe hypertonicity, but also noted that Plaintiff exhibited a lot of pain behaviors and learned tightness, and that motor examination was 5/5 throughout the lower extremities with normal tone and sensation.

●April 23, 2009, EMG ordered by Dr. Asaduzzaman indicated no evidence of lumbar radiculopathy on the left (Ex. 24F, 27-31).

●June 26, 2009 emergency room visit with complaints of back, groin and leg pain, which began after doing two days of yard work and climbing up and down a ladder (Ex. 24F, 2) (activities inconsistent with Plaintiff's claims).

●July 3, 2009, complaints of low back pain after doing painting and bending (Ex. 24 F, 18) (activities inconsistent with Plaintiff's claims).

●October 24, 2009 MRI of cervical and thoracic spine revealed no signal abnormalities of the cord in the cervical or thoracic region, mild bulging at C3-4 and C4-5, but with minimal cord flattening and remote compression deformity at T3, also a small right parasagital disc protrusion at T7-8 with minimal cord flattening noted (Ex. 25F, 6).

●January 30, 2009, upon examination for complaints of low back pain, Dr. Bhat observed only mild straight leg raise (Ex. 24F, 36).

●November 4, 2009, examined for complaints of back pain, Dr. Bhat noted that Plaintiff was remarkable only for weak grip and mild reduction in touch distally along C8 T1 distribution on the left side, but straight leg testing was negative and normal strength was noted in the lower extremities (Ex.25F, 2).

●February 15, 2010, Dr. Bhat observed that Plaintiff's low back pain was stable but his symptoms had worsened due to a slip on the snow on that date (Ex. 27F, 1)

●August 6, 2008, Dr. Gahman noted that there was no evidence of nerve root compression and that the nerve root compression from a T3 fracture would be along the ribs, stated that Plaintiff

would not have ongoing thoracic pain unless the compression fracture did not heal, and noted that there was no evidence that Plaintiff needed a hand held ambulating device and questioned the need for a cervical collar since there was no cervical problem (Ex. 20F).\

(Tr. 15, 18-20).

Therefore, based on the foregoing, this Court finds that Plaintiff's Issue No. 1 is not well taken and that there was substantial evidence for the ALJ's credibility determination as to Plaintiff's allegations of pain and, thus, the ALJ's RFC determination that Plaintiff was capable of performing a full range of light work.

**Issue No. 2: Performance of Light Work.**

Plaintiff argues that the ALJ erroneously determined that he retained the capacity to perform a range of light work.  "Light work" is defined by the Social Security Administration as: work involving lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Moreover, even where the weight lifted may be very little, a job is still in the category of "light work" if it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. For a claimant to be considered capable of performing a full or wide range of light work, an individual must be able to do substantially all of these activities. If someone can do light work, that person can also do sedentary work, unless there are other factors limiting function, e.g., loss of fine dexterity or inability to sit for long periods of time. See 20 CFR section 404.1567(b).

Plaintiff also notes that:

"...to find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th

> Cir. 1982) (en banc). Substantial gainful activity means the performance of substantial services with reasonable regularity either in competitive or self-employment. Markham v. Califano, 601 F.2d 533, 534 (10th Cir. 1979).

Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) (citations included).

On the basis of the foregoing, Plaintiff argues that substantial evidence proves that he has significant exertional restrictions that disallow light work and interfere with sustained activity, specifically his alleged low back pain which radiates into his lower extremities and precludes prolonged sitting, standing and walking; his testimony that he used a cane for support and balance (Tr. 42-43, 46-47 521-522); MRI evidence that shows a moderate wedge compression T3 deformity and disc bulge at T3-4 (Tr. 483, 567-569); examination results by consultative examiner, Wilfredo Paras, M.D. that revealed reduced deep tendon reflexes bilaterally; and Dr. Paras's opinion that Plaintiff's ability to perform work-related activities are "severely limited" by his back condition (Tr. 368-369).

On this basis Plaintiff argues that he cannot perform light work.

Plaintiff argues that these limitations and the reduction of the light exertion work base is significant, especially considering that he is currently over the age of 50.[8]

---

[8]  Medical-Vocational Rule 201.14..The Medical-Vocational Guidelines, also referred to as the "Grid Rules," allows the Secretary to take "administrative notice" of the availability of jobs in the national economy that can be performed by individuals who have the personal characteristics that Congress deems relevant: the claimant's age, education, job experience, and functional capacity to work. 42 U.S.C.S. §§ 423(d)(2)(B). They come into play at step five of the sequential evaluation process at which the Commissioner of Social Security must establish that the plaintiff possesses the residual functional capacity to perform substantial gainful activity. Grid Rule 201.14 is only applicable when the maximum sustained work capacity is limited to sedentary work, however, in the present case, Plaintiff was determined to have the capacity to perform light work.   When a claimant is over fifty years old at the time of the administrative hearing he is  "closely approaching advanced age," see 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(g).

25

Plaintiff also argues that the ALJ's reliance on the VE's testimony to establish there were jobs in the economy that Plaintiff could perform was in error, stating that substantial evidence may be produced by "reliance on testimony of the vocational expert in response to a 'hypothetical question,' but only 'if the question accurately portrays the claimant's individual physical and mental impairments.'" Varley v. Secretary of Health and Human Services, 820 F.2d 777, 779 (6th Cir. 1987) (citations omitted).  However, according to the Plaintiff the ALJ failed to pose a  proper hypothetical question, that adequately encompassed all of Plaintiff's limitations including his lifting limits and use of an ambulatory aid.  As a result, according to Plaintiff, it was improper for the ALJ to have relied on the VE's testimony.

Plaintiff's arguments to the contrary, ALJ reasonably found that Plaintiff could perform a significant number of jobs in the national economy.

Despite having posed a hypothetical question to the VE at the hearing, the fact is that, ultimately, the ALJ did not rely upon the VE's hearing testimony in rendering her Decision, rather, the ALJ looked to the Medical-Vocational Guidelines for her decision that there were jobs in the economy for someone of Plaintiff's age, education and work history who was capable of performing the full range of light work (Tr. 21).  See Pesta v. Sec'y of Health & Human Servs., No. 86-3299, 1987 WL 44868, at *7 (6th Cir. Sept. 24, 1987) (vocational expert's testimony not required where Medical-Vocational Guidelines are applicable); 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 202.14, 202.21 (showing that someone Plaintiff's age, education, previous work experience, and ability to perform the full range of light work is not disabled).[9]

---

[9]  The ALJ did rely on the opinion of the VE that Plaintiff was not able to perform any past relevant work (Tr. 20).  The ALJ made her determination that Plaintiff had the RFC to perform a full range of light work based on her review of the whole of the record (Tr. 17-20)

Accordingly, based on the foregoing, this Court finds that Plaintiff's Issue No. 2 is not well taken and that there was substantial evidence to support the ALJ's determination that Plaintiff could perform a full range of light work and that there were jobs in the economy for Plaintiff and, thus, that Plaintiff was not disabled.

**IX.  Conclusion**

For these reasons, the Magistrate Orders that Commissioner's Decision is Affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   April 30, 2012